RECORD NO. 13-4273

# IN THE
# 𝕌nited 𝕊tates 𝔻ourt of 𝔸ppeals
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

KEEGAN LEAHY,

*Defendant - Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT
The Honorable Roger W. Titus, Presiding

## OPENING BRIEF OF APPELLANT
## KEEGAN LEAHY

Michael D. Montemarano
Michael D. Montemarano, PA
Suite 146
10630 Little Patuxent Parkway
Columbia MD 21044
(410) 992-0067
montemarano67@gmail.com

*Counsel for Appellant*

**LANTAGNE LEGAL PRINTING** 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

Statement of Subject Matter and Appellate
    Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Issues Presented for Review . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    I.  There was insufficient evidence to sustain the conviction on
    conspiracy to distribute less than 50 kg of marijuana. . . . . . . . . . . . . . . . . 14

    II.  There was insufficient evidence to sustain the conviction on
    interstate travel in aid of criminal conduct. . . . . . . . . . . . . . . . . . . . . . . . 19

    III.  The trial court erred in failing to order the government to provide
    a bill of particulars as to count 8, so as to specify the travel which
    allegedly violated the Travel Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    IV.  The trial court erred in permitting the rehabilitation of a crucial
    government witness by use of his prior and ostensibly consistent
    statements as substantive evidence, in contravention of the holding of
    the Supreme Court in *United States v. Tome,* 513 U.S. 150 (1995). . . . . . 24

i

V.  The trial court erred in giving an incorrect instruction on willful blindness as this related to the conspiracy charged in count 1, and then compounded this error by repeating this incorrect instruction. . . . .  33

VI.  The government committed egregious misconduct in the deliberate overhearing of privileged communications by defense counsel, and the trial court erred in failing to require the government to explain the source of the privileged information it had obtained. . . . . . . 39

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

Certificate of Filing and Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

ii

# <u>TABLE OF CITATIONS</u>

## Cases

Page

*Brown v. State*,
   281 Md. 241 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Burks v. United States*,
   437 U.S. 1 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Glasser v. United States*,
   315 U.S. 60 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Global-Tech Appliances v. SEB S.A.*,
   563 U.S. ----, 131 S.Ct. 2060 (2011) . . . . . . . . . . . . . . . . . . . . . . . 34, 36, 37

*Jackson v. Virginia*,
   443 U.S. 307  (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

 *Ortega- Rodriguez v. United States*,
   507 U.S. 234 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*Shillinger v. Haworth*,
   70 F.3d 1132 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*State v. Lenarz*,
   22 A.3d 536, 557-558 (Conn. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*State v. Quattlebaum*,
   527 S.E.2d 105, 109 (S.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Turner v. State*,
   294 Md. 640 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*United States v. Abbas*,
   74 F.3d 506 (4th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Alter,*
    482 F.2d 1016 (9th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Automated Medical Labs., Inc.,*
    770 F.2d 399 (4th Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*United States v. Black,*
    385 U.S. 26 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45, 46

*United States v. Bostian,*
    59 F.3d 474  (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Bynum,*
    604 F.3d 161 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Danielson,*
    325 F.3d 1054 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Fletcher,*
    74 F.3d 49 (4th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Guay,*
    108 F.3d 545 (4th Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Harvey,*
    532 F.3d 326 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Howard,*
    590 F.2d 564 (4th Cir.),
    *cert. denied,* 440 U.S. 976 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Jackson,*
    863 F.2d 1168 (4th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Johnson,*
    575 F.2d 1347 (5th Cir.1978),
    *cert. denied,* 440 U.S. 907 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

iv

*United States v. Lancaster,*
     78 F.3d 888  (4th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Lara–Velasquez,*
     919 F.2d 946 (5th Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Levy,*
     577 F.2d 200 (3rd Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Lighty,*
     616 F.3d 321 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 38

*United States v. Lowe*,
     65 F.3d 1137  (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Mancuso,*
     42 F.3d 836 (4th Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. McDougall,*
     790 F.2d 1135 (4th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. O'Brien*,
     386 U.S. 345 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Pardee,*
     368 F.2d 368 (4th Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 39

*United States v. Perez-Padilla,*
     846 F.2d 1182 (9th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Romer*,
     148 F.3d 359 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Ruhe,*
     191 F.3d 376 (4th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Sanchez-Robles,*
     927 F.2d 1070 (9th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Schembari*,
    484 F.2d 931 (4th Cir.1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Schnabel*,
    939 F.2d 197 (4th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Tome*,
    513 U.S. 150 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12, 31, 32

*United States v. Tresvant*,
    677 F.2d 1018 (4th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 17

*United States v. Young*,
    609 F.3d 348 (4th C ir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Watson v. State*,
    208 Md. 210 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Will v. United States,*
    389 U.S. 90 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Wong Tai v. United States,*
    273 U.S. 77 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## Treatises, etc.

USAM, CRIMINAL RESOURCE MANUAL,
    Ch. 37, Attorney Overhearings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## Statutes

18 USC § 1952( c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 21

21 USC § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IN THE

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

————

No. 13-4273

————

**KEEGAN LEAHY,**

Appellant,

v.

**THE UNITED STATES OF AMERICA**,

Appellee.

————

BRIEF OF APPELLANT

————

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND,
NORTHERN DIVISION
(Roger W. Titus, SUSDJ)

————

Michael D. Montemarano
Michael D. Montemarano, P.A.
10630 Little Patuxent Parkway
Suite 146
Columbia, MD 21044
(410) 992-0067/Fax 992-6915

For Appellant

## STATEMENT OF  SUBJECT MATTER
## AND APPELLATE JURISDICTION

This is an appeal from final judgment in a criminal case, entered against Appellant on April 4, 2013.  JA 1351, ECF 751.  Jurisdiction in the District Court was based upon 18 U.S.C. § 3231.

By Notice of Appeal filed on April 9, 2013, JA 1363, ECF 737, Appellant requests this Court to review the final decision of the district court as to his conviction, pursuant to the jurisdiction conferred by 28 U.S.C. § 1291.

# STATEMENT OF
## THE ISSUES PRESENTED FOR REVIEW

*Issue I*

Whether there was sufficient evidence to support the verdict of guilty on Count 1, charging Mr. Leahy's participation in a conspiracy to distribute less than 50 kg of marijuana?

*Issue II*

Whether there was sufficient evidence to support the verdict of guilty on Count 8, charging Mr. Leahy's interstate travel in furtherance of criminal activity?

*Issue III*

Whether the trial court erred in failing to order the government to provide a bill of particulars as to Count 8, so as to specify the travel which allegedly violated the Travel Act?

*Issue IV*

Whether the trial court erred in permitting the rehabilitation of a crucial government witness by use of his prior – and ostensibly consistent – statements, statements which had been made only after the reason for the witness' fabrication

3

had arisen, in contravention of the holding of the Supreme Court in *United States*

*v. Tome,* 513 U.S. 150 (1995)?

*Issue V*

Whether the trial court erred in giving an incorrect instruction on willful

blindness, and then compounded this error by repeating this incorrect instruction?

*Issue VI*

Whether the governmental misconduct in invading the attorney-client

privilege in overhearing defense attorney communications was abetted by the trial

court trial court when it failed to require the government to disclose the source of

the privileged information it had gained from this misconduct ?

## STATEMENT OF THE CASE

Mr. Leahy was charged in a sixteen-count second superseding Indictment ("the Indictment") JA 34, ECF 341, filed in the District of Maryland on May 2, 2012, with conspiracy to distribute more than 1000 kg of marijuana (21 USC § 846; count 1); money laundering (18 USC § 1956; counts 2 and 8); and interstate travel in furtherance of criminal conduct (18 USC § 1952; count 14),[1] arising out of events in the period from 2001 through 2009. The conduct alleged against Mr. Leahy took place during a period essentially of one year in duration from 2008 and 2009.

Motions were heard on June 22, 2012, in the United States District Court for the District of Maryland, Southern Division, at Baltimore, before the Honorable Roger W. Titus, SUSDJ. Trial was held before a jury from September 11 through November 1, 2012, for a total of 25 trial days. JA 16-18; docket. On November 1, jury returned a verdict of guilty as to counts 1 and 8, and a verdict of not guilty on Counts 2 and 7. JA 18, docket.

At sentencing on April 1, 2013, Mr. Leahy received concurrent sentences of 36 months (3 years) on each count. JA 1351, ECF 735. Appellant noted a timely appeal on April 9, 2013. JA 1363, ECF 737.

---

[1] Prior to trial the indictment was amended to reflect only those three defendants going to trial. JA 79, ECF 455. In the amended indictment, count 8 was changed to count 7, and count 14 became count 8.

## STATEMENT OF FACTS

Considered broadly, the various iterations of the indictment alleged a multi-year, multi-state conspiracy to traffick marijuana. Mr. Leahy's alleged role was limited to a one-year period during 2008–2009, when he supposedly flew cash to California and marijuana to Maryland, using various aircraft rented and owned by members of the conspiracy. No fewer than thirteen defendants were joined in the original indictment, several of whom were – and remain to this day – fugitives. The final tally in the last indictment was sixteen defendants, several of whom cooperated and testified at trial.

The conspiracy was headed by Nicka and D'Amico. They supervised the transport and delivery of marijuana to the others in the conspiracy. Both also had actual business interests, which served as cover for their illegal activities, and permitted them to present as legitimate business interests. The marijuana had its origin in northern California, and was transported to Maryland, and then to other states as well. For the most part, the marijuana was transported via tractor trailer from California to Maryland, with cash returning via automobile, though most witnesses were less than clear on this, as they did not partipate directly. *See* JA 455A-455D.

At some point in about 2008 D'Amico determined, in consultation

with Costello, a subordinate involved in transporting of marijuana, to undertake to transport cash and marijuana via light aircraft. As was uncontroverted at trial, Costello at that point had been engaged in detailed business discussions with Mr. Leahy via email for a period of many months, commencing in 2007. JA ; 1288-1310, defense exhibits 24-32 (emails documenting these discussions) These discussions concerned certain energy-related business ventures, in an attempt to leverage Mr. Leahy's ties to the aboriginal people of Canada, from whom he was descended, and were to last into early 2010. JA 1311-1328, defense exhibits 41-52 (emails documenting these discussions).

As Mr. Leahy as the "only pilot" he knew, Costello suggested him to D'Amico as a person who might be interested in flying on their behalf. Costello then contacted Mr. Leahy in early 2008, but specifically did not inform him of the illegal nature of the transport, nor of the underlying marijuana trafficking enterprise. At trial, Costello was to claim that he eventually revealed this to Leahy, however, this claim and most of the others he made were entirely unsupported by any independent evidence and uncorroborated, if not actually refuted, by other witnesses. Costello claimed, in an entirely vague and uncorroborated fashion, to have met Mr. Leahy to discuss this enterprise, a meeting which he claimed to have taken place in a Target parking lot in suburban

7

Chicago.  JA 561-562, 619.  Uncontroverted documents regarding discussions

centered around the scheduling of this meeting, which were entered into evidence

at trial by Mr. Leahy, made clear that this meeting did not take place in Chicago --

if it took place at all, since there was no documentation.

A later search in 2009 of a premises on Hickory Avenue  in Baltimore

belonging to D'Amico was to yield approximately $30,000 and 37 kg of

marijuana, along with false identification documents relating to him.  By contrast,

there was no indication of the use of other or false identities by Mr. Leahy.  JA

157A-157P.  The search also revealed  documents relating to the purchase of an

airplane from Sherwin by a company owned by D'Amico.  As the intended pilot,

Mr. Leahy played a role in the purchase by taking the aircraft for a test flight, and

his name was found on the documents related to the plane involving registration

and insurance.  JA 137-139.  The account from payments were made, however,

was controlled solely by D'Amico.  JA 909A-909C.  Sherwin testified that Mr.

Leahy had been present for the sale, along with D'Amico, and that D'Amico

presented at all times like a reasonable businessman and who did not raise any

concerns on Sherwin's part for any reason, even to the extent of his making cash

payments in the tens of thousands of dollars. JA 468-472; *see also* 886A-886D (no

issue in cash payments to aircraft rental agencies).  Eventually the plane was

damaged on a landing in Hays, KS, and when seized by the government was

scanned by a drug dog, which yielded negative results, notwithstanding claims that

it had been used to ferry marijuana. JA1109B. This was of a piece with the

claims by government witnesses that rental aircraft had been used to ferry

marijuana, and "wreaked" of it [*sic*], JA 700, *see also* 588, while the rental

agencies stated unequivocally that the aircraft did not have any odor upon being

returned, JA 868A-868D. He did state he never saw Mr. Leahy carrying marijuana

himself. JA 560-561.

Costello also testified about a flight involving Mr. Leahy and

D'Amico, with a pilot named Stone, from Baltimore to San Francisco in March,

2009, which was to firm the basis for the Travel Act count. JA 559-562, 606-607,

623-624. He also claimed that Mr. Leahy had visited the Hickory Avenue address

on one occasion.

Another conspirator, Sharpeta, testified prior to Costello. While he

claimed the existence of light aircraft flights of money and drugs west and east,

respectively, he was unable to provide any further detail. He also claimed the pilot

was named "Keegan," but during the two days he was on the stand did not identify

Mr. Leahy.   JA 158-400, *passim; cf.* JA 196-200, 223-224, 267-269, 365, 374

(all mentions of "Keegan" by Sharpeta, absent any identification, are contained on

these twelve pages).

Evidence and examination at trial established without question that both Costello and Sharpeta had extensive prior records for narcotics involvement, and repeated instances of lying to the authorities, under oath and otherwise, which proposition each accepted, albeit grudgingly.

Additional facts will be adduced as necessary in the several Arguments, *infra*.

# SUMMARY OF THE ARGUMENT

*Issue I*

There was insufficient evidence to establish Mr. Leahy's entry into the conspiracy to traffick even a lesser amount of marijuana than charged. The sole witness to link Mr. Leahy to marijuana, Costello, was uncorroborated to any extent by any other witness, and specifically refuted by other government witnesses, leaving his unsupported claims to stand alone.

*Issue II*

There was insufficient evidence to establish Mr. Leahy's travel interstate in aid of criminal activity.

*Issue III*

The defense was entitled to a bill of particulars geared to identifying the specific flights and or cargo which Mr. Leahy participated in and which constituted the violation(s) of count 8, since acts violative of the statute are not necessarily obviously or *per se* illegal.

11

*Issue IV*

The government was incorrectly permitted to rehabilitate a crucial witness against Mr. Leahy by the use of the witness' prior consistent statements as substantive evidence, almost without the imposition of any restraint by the district court. In that the incentive for the witness to fabricate arose well before these statements had been made, their use runs afoul of the Supreme Court's holding in *United States v. Tome,* 513 U.S. 150 (1995).


*Issue V*

The jury instruction regarding willful blindness was incorrect as a matter of law, and this error was amplified by the repetition of the incorrect instruction. The instruction incorrectly under-emphasized the importance of the high probability of the existence of facts supporting criminal conduct, and deliberate actions by the defendant to avoid learning those facts.


*Issue VI*

At sentencing, government counsel revealed herself to be in possession of information which only could have been obtained by the overhearing of privileged communications involving defense counsel. This implicated the Sixth

12

Amendment rights of the defendants. When the defense moved for the disclosure of same, the government did not provide information describing the basis for this knowledge. The district court committed egregious error by accepting the government's non-responsive filing, and failing to require the government to provide this information.

# ARGUMENT

## I. THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN THE CONVICTION ON CONSPIRACY TO DISTRIBUTE LESS THAN 50 KG OF MARIJUANA.

## Standard of Review

This Court reviews a district court's ruling on a motion for judgment of acquittal *de novo. United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998). The Court must determine whether a rational jury could have found the essential elements of the crime beyond a reasonable doubt, and in this determination considers the evidence in the light most favorable to the government. *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982); *United States v. Bynum*, 604 F.3d 161 (4th Cir. 2010). A jury verdict will be upheld if there is "substantial evidence" to support it, *Glasser v. United States*, 315 U.S. 60, 80 (1942), and this is defined as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Young*, 609 F.3d 348, 355 (4th C ir. 2010). In determining whether there is substantial evidence, the court should allow the government "all reasonable inferences that could be drawn in its favor." *United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008).

14

**Argument**

The verdict of a trial jury will be upheld if there is substantial evidence to support it. *Burks v. United States,* 437 U.S. 1, 17 (1978). In undertaking this review, the appellate court will accord the Government all reasonable inferences from the facts and evidence properly adduced to those propositions which the Government seeks to establish, *United States v. Tresvant,* 677 F.2d at 1021, viewing the evidence in the light most favorable to the Government, *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). The standard is the familiar one, whether "any rational trier of fact" could have found the elements of the offense to exist to the reasonable doubt standard. *Id*.

Where, however, the record shows a lack of evidence from which a jury could find guilt beyond a reasonable doubt, the conviction should be reversed and the matter remanded for the entry of a judgment of acquittal. *See United States v. Lowe*, 65 F.3d 1137, 1142 (4th Cir. 1995); *Jackson v. Virginia*, 443 U.S. at 317 ("[A] properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt . . . . In a federal trial, such an occurrence has traditionally been deemed to require reversal of the conviction."); *Ortega- Rodriguez v. United States*, 507 U.S. 234, 249 (1993) ("In the class of appeals premised on insufficiency of the evidence, . . . retrial is

not permitted in the event of reversal.").

The only witness directly to implicate Mr. Leahy was Costello, who freely admitted his dishonesty, particularly his willingness to lie to benefit himself, JA 703-707, including have lied to the police and fabricated extensively during a prior arrest, as well as the present case when he agreed with D'Amico to mislead law enforcement and did, for $50,000. JA 715-722. Lest it be misconceived that Costello's dishonesty was of a primarily historical nature, he also admitted on the stand even to lies regarding his attempt to regain possession of the aircraft purchased from Sherwin, JA 721-726, in making the patently fraudulent claim that the aircraft was obtained via legal means, JA 1282, defense exhibit 11, although he knew it had been paid for by D'Amico using drug money. On some occasions, Costello related, his fabrications "spun out of control," JA 740, leaving him ensnared in a tangled web of his own misprision. Costello did admit he never discussed marijuana trafficking with Mr. Leahy, JA 922-923, never saw marijuana transported himself, JA 924, and had no knowledge as to whether Mr. Leahy knew there was marijuana on any of the flights, JA 925.

Costello did claim there had been a meeting to discuss the marijuana trafficking business, involving himself, D'Amico and Mr. Leahy, which took place in San Francisco after a cross-country flight by D'Amico and Mr. Leahy. On this

16

flight, money was hauled in large duffel bags, and the cabin of the aircraft stank of marijuana.   JA 587-592.

Other claims by the government were dispelled by their own witnesses.  Mr. Leahy did not inspect his passengers bags because that was never done by a pilot, to which point every pilot witness agreed.  JA 690 (Swanberg); 970-972 (Stone); 1057-1058 (Phillips); 1096 (Hawes).   All of the pilots save Hawes were government witnesses.   A wire transfer of $100,000 on behalf of Costello was made by Mr. Leahy, of which the government made much, but it was made for Costello only because there were no Bank of America branches in Hawaii where he lived.  JA 587-592.

The weak and entirely circumstantial case proffered by the government, based on no more upon an unabashed serial deceiver, *see, e.g., & c.f., United States v. Jackson,* 863 F.2d 1168, 1173 (4th Cir. 1989) (circumstantial evidence adequate to uphold verdict), crucially relied upon the impermissible inferences, *cf. United States v. Tresvant,* 677 F.2d at 1021, that flowed directly and intentionally from uncorroborated cooperator testimony.  Much of Costello's testimony revolved around a phantom meeting which allegedly took place in Chicago.  JA 561-562.  No travel documents or other substantiation of this meeting were available.  On cross-examination, however, defense counsel

17

carefully took Costello through the trail of electronic communication between him and Mr. Leahy.  In so doing, and in light of the entire lack of any form of corroboration of the meeting, counsel established beyond any reasonable doubt that Costello was fabricating this testimony, a conclusion made manifest without considering Costello's admitted and serial dishonesty.  The emails and texts established that Mr. Leahy was in Canada during this time, from where he proposed to travel "down" to prospective meeting locations like Duluth or Minneapolis, locations south (i.e., "down") from the Leahy home in Ontario, Canada, and north (or up) from Chicago.  JA 752-769, 1285, defense exhibit 16 (at top).  Several cities for this meeting were discussed, to include Winnipeg, Duluth and Minneapolis, but, interesting, not Chicago.  JA 1288-1287, defense exhibit 16.  Simply put, all that there was to substantiate a meeting having taken place, let alone one in Chicago, was Costello, and he cannot be considered any manner legally sufficient.

It is of value in the context of the entirely unbelievable, *see Jackson v. Virginia,* 443 U.S. at 319, and independently refuted testimony of Costello, to note that in many jurisdictions accomplice testimony by itself is insufficient as a matter of law to found a conviction of a crime, absent corroboration of the claimed conduct of the defendant.  *Turner v. State,* 294 Md. 640, 640-41 (1982) ("the rule

18

requiring corroboration presumes that the accomplice's testimony, by itself, is untrustworthy.");  *Brown v. State*, 281 Md. 241, 243-246 (1977); *see Watson v. State*, 208 Md. 210, 217 (1955).

Mr. Leahy's conviction on count 1 therefore should be vacated, with prejudice.


## II.  THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN THE CONVICTION ON INTERSTATE TRAVEL IN AID OF CRIMINAL CONDUCT.

### Incorporation of Standard of Review and Argument

Mr. Leahy hereby incorporates the entirety of the standard of review and argument set forth in Issue I, *supra,* as if fully set forth in this portion of the Argument.

### Argument

The Travel Act conviction on count 8 was based upon a flight on March 17, 2009, taken by Mr. Leahy and another pilot, Stone, with D'Amico, from Baltimore to San Francisco.  To establish the illegal component of this flight, the government called Stone, a pilot on this flight with Mr. Leahy, to corroborate Costello's further testimony regarding this flight.  JA 941-980.  The government's attempt through Stone to establish conduct which ostensibly constituted a

violation of the Travel Act failed miserably.

Stone did not corroborate Costello to any degree, except that they did meet at one point in San Francisco in March of 2009, along with D'Amico and Leahy. JA 951. No other detail provided by Stone matched Costello's tale. Stone did not recall a meeting with Costello, D'Amico and Mr. Leahy from which he was excluded, JA 950, while Costello had claimed that he met with them, but without Stone, JA 587-592. Stone did not concur with Costello's claim that any duffel-type bags were transported on this flight in either direction, JA 970-971, nor that the cabin smelled of marijuana, which odor he would recognize, or any other unusual or uncommon odor, JA 961. He agreed that cash was a not uncommon medium of payment for pilot fees and expenses, JA 962-963, and that a fee of $1500 was reasonable for a private pilot. Most particularly, he agreed that a total price of $12-15,000, to include the pilot's fee and expenses (e.g., rental and fuel) was not unreasonable for a private cross-country flight in a rented aircraft, and even could run up to $25,000 for jet travel. JA 976-977. Lastly, he made clear that a pilot never checked the bags of his passengers, in corroboration of the other pilots who had testified and been questioned on this point. JA 970-971. All of the pilots save Hawes were government witnesses.

Simply put, there was no credible evidence to support the notion that

this flight had been in furtherance of any criminal activity.  This is all the more

obvious when juxtaposed with the tales previously spun by Costello, *see*

Argument I, *supra,* in particular about the non-existent Chicago meeting.  Mr.

Leahy's conviction on count 8 therefore should be vacated, with prejudice.


## III.  THE TRIAL COURT ERRED IN FAILING TO ORDER THE GOVERNMENT TO PROVIDE A BILL OF PARTICULARS AS TO COUNT 8, SO AS TO SPECIFY THE TRAVEL WHICH ALLEGEDLY VIOLATED THE TRAVEL ACT.

### Standard of Review

This Court should review the district court's denial of a bill of

particulars under an abuse of discretion standard.  *United States v. McDougall*,

790 F.2d 1135, 1153 (4th Cir. 1986).

### Argument

The defense moved for a bill of particulars as to the specific count

charging interstate travel in aid of criminal conduct, under 18 USC §1952. JA 60,

ECF 351.  Specifically, the defense sought "very limited information," JA 66,

regarding the otherwise legitimate flights which constituted this travel, and

information regarding the alleged cargo, in that transporting cash is not the same

as transporting marijuana.  JA 66-67, 72.  Were this information to be provided

with the *Jencks* material a week before trial, the defense argued, it would be too

late for an independent defense investigation which necessarily would span the

United States.  JA 65-72.  This also would impinge upon the issue of the witnesses

necessary to defend against this charge.  JA 68.  Essentially, the defense request

boiled down to "what Mr. Leahy actually did and when he did it."  JA 68, lines 18-

19.  It must be remembered that the conduct underlying a Travel Act violation

often (if not usually) is legal, but for its alleged relation to criminal conduct, and

not illegal in and of itself without such relation, in contrast to conduct such as

drug trafficking or bank robbery, which obviously can never be legal.

      The court denied the motion, finding that the defense was "seeking to

require the government to weave the information at its command into the work of

a fully integrated trial theory for the benefit of the defendants."  This ruling was

erroneous.  JA 75.

      The district court clearly had discretion to order the limited bill of

particulars requested by Mr. Leahy.  *Will v. United States,* 389 U.S. 90, 98-99

(1967); *Wong Tai v. United States,* 273 U.S. 77, 82 (1927).   A bill of particulars

"merely amplifies the indictment by providing missing or additional information

so that the defendant can effectively prepare for trial."  *United States v. Howard*,

590 F.2d 564, 567 (4th Cir.), *cert. denied,* 440 U.S. 976 (1979); *United States v.

Johnson*, 575 F.2d 1347, 1356 (5th Cir.1978), *cert. denied,* 440 U.S. 907 (1979).

22

Its purpose is "to fairly apprise the defendant of the charges against him so that he may adequately prepare a defense and avoid surprise at trial." *United States v. Automated Medical Labs., Inc.,* 770 F.2d 399, 405 (4th Cir.1985) (citation omitted); *see also United States v. Schembari,* 484 F.2d 931, 934-35 (4th Cir.1973). The defense requested no more than this, and the averments by trial counsel in the motion and hearing were prescient indeed, in referencing an ability to defend against a claim regarding a particular instance of travel.

As pointed out by the defense in its Rule 29 and 33 post-trial motions, ECF 599, the bill of particulars would have nailed down the government's theory of the case, which underwent substantial change between opening and closing arguments. The purpose of the March 19, 2010, flight changed from a claim of drug and money transport (in opening) to codefendant D'Amico's purpose to determine whether he wanted to purchase the plane, with the government conceding that the flight had not involved transport of drugs or of money. This variance between the conduct underlying the charges as alleged and the proof adduced at trial is the very definition of unfair surprise. *United States v. Fletcher,* 74 F.3d 49, 53-54 (4th Cir.1996). And, as such it fails to sustain the verdict on this count, as argued, *supra.*

**IV. THE TRIAL COURT ERRED IN PERMITTING THE REHABILITATION OF A CRUCIAL GOVERNMENT WITNESS BY USE OF HIS PRIOR AND OSTENSIBLY CONSISTENT STATEMENTS AS SUBSTANTIVE EVIDENCE, IN CONTRAVENTION OF THE HOLDING OF THE SUPREME COURT IN *UNITED STATES V. TOME*, 513 U.S. 150 (1995).**

<u>**Standard of Review**</u>

The decision regarding the admission of evidence is vested in the discretion of the trial court, and is reviewed by this Court for the abuse of this discretion. *United States v. Lancaster,* 78 F.3d 888, 896 (4th Cir. 1996); *United States v. Bostian*, 59 F.3d 474, 480 (4th Cir. 1995).

<u>**Argument**</u>

As noted previously, only two witnesses proffered by the government were to provide any testimony as to Mr. Leahy and his relation to the conspiracy, Sharpeta and Costello, both of whom were cooperating codefendants. Sharpeta was the earlier to the two to testify, thereby setting the tone for the government's case against Mr. Leahy. Even so, however, Sharpeta was unable to identify Mr. Leahy as he sat in the courtroom during his two days of testimony, nor was he even asked to essay such an identification. JA 158-400, *passim.*

After his less-than scintillating time on direct examination, Sharpeta was subjected to rigorous and extensive cross-examination by trial counsel for Mr. Leahy. On cross, he repeatedly backtracked, temporized, disavowed or was forced

24

to explain his statements on direct, especially when confronted with his prior

testimony under oath on several occasions before the grand jury.  Sharpeta

repeatedly was forced to acknowledge prior drug dealing – while at the same time

he was brokering marijuana deals for Nicka, the lead defendant on the indictment.

These admissions were all the more glaring, in that he had not acknowledged this

before the grand jury, where he claimed no involvement with marijuana

distribution "before 2008."  JA 226-240.  In refuting this lack of involvement,

defense counsel established prior conduct on the part of Sharpeta, to include

marijuana trafficking in Louisiana in 2004, and a traffic stop  in Missouri which

located $197,500 in cash in his car, also in 2004.  JA 230-240.

        This plainly was "before 2008," although Sharpeta had an

explanation, of sorts, for this.

Q:    Okay. So when you said no [drug dealing before 2008], and you told the
      grand jury that, that was a lie, correct?

A:    See. I've never been put in this kind of position or predicament before, and
      when I answered that it was a highly stressed environment and situation.
      And my understanding of the preceding questions was my involvement,
      direct involvement with the marijuana as I was prior to 2000 -- June of
      2008.

JA 231-232.

         Sharpeta was too clever by half, attempting to parse the question as

relating to "direct" involvement, whatever that might mean, as he had done before

25

the grand jury. Ultimately, since Leahy's counsel challenged and discredited him at trial in ways that government counsel did not choose to before the grand jury, he was forced to concede the point advanced by Mr. Leahy's counsel.

> Q:   Now, on March 30th, 2010, your first grand jury appearance, you lied to the grand jury more than once with respect to your relationship to Matt Nicka, correct?

> A:   Yes, that's why they brought me back.

JA 261. Apparently his serial dishonesty was of no great concern to the government.

> Q:   Right. So now that you've had a chance to review the grand jury testimony, your grand jury testimony, would you agree that you lied to the grand jury with respect to your relationship with Matt Nicka prior to 2008?

> A:   Like I said, they brought me back to clarify a lot of the stuff because, you know, I was new to the process. And from the beginning I've said that Matt Nicka and I have been good friends.

> Q:    And I understand they brought you back a second time. But my question is, with respect to this question and this answer, and what relationship did you have with him prior to 2008, I mean, he was just a friend, I talked to him maybe a couple times a month. That was a lie, correct? You were involved in the marijuana distribution business with him, correct?

> A:   Yes.

JA 262-263.

26

Sharpeta then admitted to destroying evidence, 263, suborning perjury, JA 263-264, and the use of false identifications, JA 265-266.  Ultimately, trial counsel circled Sharpeta back to his changeable story that he gave to law enforcement, regarding a person named "Keegan,"[2] and his carrying golf or hockey bags (depending on the iteration of his tale) from the airport.  JA 265-270.  Sharpeta's recollection, as documented in the law enforcement reports, changed with each of the several debriefings as the government attempted to cand he admitted to imperfections in his recollection.

> A:     I don't exactly recall all the different conversations I had with them.

JA 268.

> A:     I don't recall telling them that.

JA 269.

> A:     I've talked to the government probably over 40 hours, so I don't really, you know, recall all the conversations I've had with them.

JA 269.

> A:     I mean, it [the law enforcement report] would indicate that I -- certain statement that I don't recall now.

JA 269.

---

[2] "Keegan" was claimed to have been the name given by the pilot Sharpeta met, but he did not identify Mr. Leahy nor did he provide a physical description.

A:    I said best of my recollection right now.

JA 269.

A:    It's been over four years since all that happened, but my recollection that's how it, you know, it happened.

Q:    Your recollection has changed over time, correct?

A:    The specifics have not.

JA 270.

Testimony, however, is about specifics, and Sharpeta's testimony was as unspecific as it was inconsistent.  Given a crack at him in turn, McIntosh's attorney was even less sparing of Sharpeta.

Q:    Okay. And then there was another interview a few weeks later on May 1, 2008, do you recall that?

A:    I don't know exact meetings, but that sounds about right.

Q:    Did you have one by phone perhaps?

A:    Yes.

Q:    Do you think that may have been a phone interview? You're not sure?

A:    Yeah I couldn't tell you when the phone interviews were or when I came down.

Q:    Okay. And each time you had a interview, either in person or on the phone, your lawyer was with you?

A:    Correct.

Q:     And there were prosecutors asking questions and/or agents asking questions?

A:     Correct.

Q:     And then you appeared before the grand jury in June?

A:     Correct.

Q:     Did you meet with the government again that morning before you appeared before the grand jury?

A:     I'm sure I did, I don't really have an exact recollection of all the events that took place that day.

Q:     Okay. And then you met again with them November 3rd of 2010, do you recall that?

A:     Like I said, I met with them a lot. I don't really recall the exact dates of meetings.

Q:     And did they -- at these subsequent meetings, did they say to you that they wanted to clarify things because what you had told them earlier was not what they believed?

A:     They wanted to clarify things, and there were things a little more in depth.

JA 292-293.

So, while the government did not believe Sharpeta, it expected the jury to accept his tales.  It must be remembered that Sharpeta was not asked, not did he volunteer, an identification of Mr. Leahy, who sat hardly twenty feet from him for two days, nor was he prompted by any inquires regarding a physical

description or resemblance between the individual sitting next to defense counsel and "Keegan," whom the government claimed was the alleged pilot. This, notwithstanding Sharpeta's interactions with "Keegan," to include riding with him in planes and cars, speaking with him, and delivering him money from D'Amico. JA 196-200, 223-224, 267-269, 365, 374 (all mentions of "Keegan" by Sharpeta are contained on these pages). The only, and ineluctable, conclusion to be drawn from this is that Mr. Leahy was not the pilot.

In an attempt to rehabilitate Sharpeta on redirect, government counsel undertook to present him with his prior testimony from the grand jury, and to ask him what he had stated at that time, asking him if this refreshed his recollection – even without a demonstration of a need to refresh the witness' recollection.

Q:    Does that refresh your recollection what you told the government about Joseph Spain when you first met with the government?

JA 361.

This provoked an immediate and specific objection from counsel, JA 361, culminating in a specific description of the problem before the district court under Rule 801.

But what he told the government is irrelevant. And they're using it to try to rehabilitate him. And they cannot use a document that was prepared after the reason for his lying came to be. And the reason for his lying started the day he started cooperating with the government, by his own admission.

30

JA 363 (counsel for McIntosh).  The court, however, permitted this to go on for over fifteen pages, over defense counsel's continuing objection and without any sort of explanation of the basis for this.

Q:    And looking at paragraph 6.

JA 363.

Q:    Let me direct your attention to page 13 and 14.

JA 371.

Q:    Do you remember what you told the grand jury about who set up Phil to drive for the conspiracy?

JA 375.

Q:     Do you remember how many times -- or what you told the grand jury about how many times you counted a million dollar?

JA 379.

These statements by Sharpeta were entirely inadmissible, and the entire line of questioning using them as a predicate should have been stricken when counsel objected and moved to strike.  JA 383-384.

The Supreme Court has considered this issue in *United States v. Tome*, 513 U.S. 150 (1995).  Its holding, and the rationale underlying it, was as succinct as it was clear.

If the Rule [Federal Rule of Evidence 801] were to permit the introduction of prior statements as substantive evidence to rebut every

> implicit charge that a witness' in-court testimony results from recent
> fabrication or improper influence or motive, the whole emphasis of
> the trial could shift to the out-of-court statements, not the in-court
> ones.

*Id.* at 165. This was exactly as the trial of Mr. Leahy was to develop. The Court

ameliorated this potential problem by restricting the admission of such statements.

> Our holding is confined to the requirements for admission under Rule
> 801(d)(1)(B). The Rule permits the introduction of a declarant's
> consistent out-of-court statements to rebut a charge of recent
> fabrication or improper influence or motive only when those
> statements were made before the charged recent fabrication or
> improper influence or motive. These conditions of admissibility were
> not established here.

*Id.* at 167. Nor was it in the trial below.

District court clearly erred in permitting the government to use

the prior hearsay statements of Sharpeta as substantive evidence. In light of the

crucial aspect of Sharpeta's testimony against Mr. Leahy, and his being the first

witness who spoke in any fashion, however limited, to Mr. Leahy's involvement,

this error was crucial as it was significant. Reversal is mandated in light of the

limited and inadequate extent of the evidence against Mr. Leahy.

32

**V.  THE TRIAL COURT ERRED IN GIVING AN INCORRECT INSTRUCTION ON WILLFUL BLINDNESS AS THIS RELATED TO THE CONSPIRACY CHARGED IN COUNT 1, AND THEN COMPOUNDED THIS ERROR BY REPEATING THIS INCORRECT INSTRUCTION.**

**Standard of Review**

This Court reviews allegations of improper jury instructions *de novo*.

*United States v. Pardee,* 368 F.2d 368 (4th Cir. 1966).

**Argument**

The government filed proposed jury instructions on September 6, 2012.  JA 15, docket ECF 445.  The defense filed a request for specific jury instructions on September 27.  JA 401, ECF 480.  The defense supplemented these with objections to the government's requested instructions on October 17, JA 1110, ECF 518, and further requested jury instructions on October 18, JA 1122A-1122E, ECF 520.  The court provided its draft of proposed jury instructions to counsel also on October 17.  JA 18, docket ECF 519.

At the charging conference on October 25, defense counsel challenged the proposed instruction on willful blindness.  An extended discussion and disagreement took place over the evidentiary predicate to the giving of this instruction, and the correct wording of the instruction.  The instruction the district court arrived at was objected to by the defense.  JA 1138-1173.

The final jury instructions were docketed on October 26.  JA 1182,

33

ECF 533.  The instruction regarding willful blindness set out therein, at pp. 37-39,

JA 1218-1220, is incorrect, which served to deny Mr. Leahy a fair trial.

Consideration of the evidence against him by the jury was framed within the

incorrect nature of the instruction.

There were several errors in the instruction given by the district court.

As given, the instruction failed to weight properly the jury's need to find Mr.

Leahy's conscious avoidance of facts, for what is required is actions by the

defendant with a conscious purpose to avoid learning the truth, when he believes

there is a "high probability" of the esixtence of facts which would inform him of

the illegality.  *Global-Tech Appliances v. SEB S.A.*, 563 U.S. ----, 131 S.Ct. 2060,

2070 (2011).

The appellate authority concerning this instruction is replete with

admonitory cautions regarding its use, since it "is only proper in 'rare

circumstances.'"  *United States v. Ruhe,* 191 F.3d 376, 385 (4th Cir.1999), *citing*

*United States v. Lara–Velasquez,* 919 F.2d 946, 951 (5th Cir.1990).

> Courts often are wary of giving a willful blindness instruction,
> because of the danger they perceive in it allowing the jury to convict
> based on an *ex post facto* 'he should have been more careful' theory
> or to convict on mere negligence ("the defendant should have known
> his conduct was illegal"). *United States v. Sanchez-Robles,* 927 F.2d
> 1070 (9th Cir.1991). Courts therefore restrict the use to cases not only
> where there is asserted lack of knowledge but also where there is
> evidence of deliberate ignorance. *Id.*

*United States v. Mancuso*, 42 F.3d 836, 846 (4th Cir.1994); *United States v. Abbas,* 74 F.3d 506, 513 (4th Cir.1996). Initially, to permit the instruction to be given it is required that there be an actual foundation in the evidence. *United States v. Schnabel,* 939 F.2d 197, 203 (4th Cir.1991). It is error to give this instruction when unsupported by the facts.

> All of the government's evidence tended to show that [appellant] Flood was an active participant in the conspiracy to kidnap, the kidnapping resulting in murder, and the firearms charges. Indeed, the government argued to the jury that Flood "was an active participant in the conspiracy to kidnap Mr. Hayes, and, indeed, an active participant in the kidnapping." The government's argument was premised on its evidence showing that Flood "provided the car and the phone that made the commission of [the kidnapping resulting in murder] possible from its inception, ... [and that] [w]ithout Flood's assistance, without his aid, that crime could not have been successful." There simply was no evidence that Flood deliberately avoided, or closed his eyes to, Hayes' kidnapping and murder.

*United States v. Lighty,* 616 F.3d 321, 378 (4th Cir. 2010); *see also United States v. Perez-Padilla,* 846 F.2d 1182, 1183 (9th Cir.1988). By contrast to the "wide variety of fraudulent practices" at his firm to which the defendant closed his eyes, *United States v. Schnabel,* 939 F.3d at 204, making the instruction appropriate, at Mr. Leahy's trial the testimony of Costello made clear that Mr. Leahy deliberately was not consulted regarding the marijuana trafficking – indeed, the fear among those in the know was that he would report this to the authorities if he found out, JA 701-702, but ultimately was informed. The government's claim plainly was

that Mr. Leahy was an active participant.

The key element to the instruction, when properly given, is that the jury not be permitted to infer guilty knowledge from a mere showing of careless disregard or mistake, which is done addressing the "two basic requirements" for this charge on which courts agree, that (1) the defendant subjectively believe that there is a high probability that the fact exists, and (2) the defendant takes deliberate actions to avoid learning that fact. *Global-Tech Appliances v. SEB S.A.*, 131 S.Ct. at 2070. This narrow interpretation is necessary to ensure the instruction, which is purely an **exception** to the general rule on knowledge, is applied correctly.

> We think these requirements give willful blindness an appropriately limited scope that surpasses recklessness and negligence. Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts

*Id.* at 2070-71.

The trial jury for Mr. Leahy was permitted to do exactly this, by the incorrect and inadequate  wording of the instruction was compounded by its **partial** repetition later in the instructions.

> In  the case of the defendant Leahy, his knowledge may also be established by proof that he had a strong suspicion that someone withheld important facts, yet shut his eyes for fear of what he would learn, as I have previously explained.

36

JA 1259. The reiteration fails to address the actual belief by the defendant that the fact does not exist, or purposely contrived or deliberately avoided learning that the fact existed. The concept of willful blindness requires active or deliberate action, and evidence to establish this, and this passing reference only could serve to confuse the jury on these crucial points. *Global-Tech Appliances v. SEB S.A.*, 131 S.Ct. at 2070-71.

Neither at pp. 37-39 nor at p. 78 of the instructions, JA 1218-1220, 1259, ECF 533, do the instructions speak to the mandatory requirement that the jury find beyond a reasonable doubt that Mr. Leahy act with a conscious purpose to avoid learning the truth about what he would not want to know – the illegal purpose for the flights. To paraphrase the Supreme Court, "the [trial court's] test does not require active efforts by an inducer to avoid knowing about the [illegal] nature of the activities." *Global-Tech Appliances,* 131 S.Ct. at 2071. Nor did the instruction it speak to whether Mr. Leahy might have had an honest belief that the flights were legitimately purposed, which would have rendered him not willfully blind. *United States v. Guay,* 108 F.3d 545, 551 (4th Cir.1997). The government's claim was active participation – as witnessed by role in the purchase of the aircraft from Sherwin, including the $100,000 wire transfer for Costello, and his filing registration documents for the aircraft. This was entirely incompatible with

the government's contention of his actual knowledge and active participation.

Lastly, the issue of knowledge was not a component of the defense in this matter. Defense counsel made this amply clear during the charging conference, that he would be arguing actual factual innocence, and not a lack of knowledge, and furthermore averred that if he attempted to suggest otherwise, that the court then could instruct on willful blindness and could do without objection from the defense. JA 1138-1146. This is an important consideration regarding the propriety of giving this instruction, as this Court has held, in its awareness that the instruction is an exception to the general rule, and limited in use to the proper factual context, if it is to be used properly. The use of the instruction of willful blindness without the appropriate factual predicate is error in and of itself.

> Moreover, Flood's defense was not premised on the notion that he was unaware of what was transpiring around him. Rather, his defense was that he was not present at all during the kidnapping and murder of Hayes.

*United States v. Lighty,* 616 F.3d at 378.[3]

The error in giving the wrong instruction therefore was compounded by the district court, in giving the instruction where it was not merited by the factual record. Reversal is required in light of the limited case against Mr. Leahy.

---

[3]     It is of some import to note that trial counsel for the government in Mr. Leahy's case was also counsel of record, at both trial and appeal, in *Lighty. See* 616 F.3d at 335.

**VI.  THE GOVERNMENT COMMITTED EGREGIOUS MISCONDUCT IN THE DELIBERATE OVERHEARING OF PRIVILEGED COMMUNICATIONS BY DEFENSE COUNSEL, AND THE TRIAL COURT ERRED IN FAILING TO REQUIRE THE GOVERNMENT TO EXPLAIN THE SOURCE OF THE PRIVILEGED INFORMATION IT HAD OBTAINED.**

**Standard of Review**

This Court reviews allegations of improper jury instructions *de novo.*

*United States v. Pardee,* 368 F.2d 368 (4th Cir. 1966).

**Procedural Background**

At sentencing, government counsel averred to both the existence of communications between defense counsel[4] and an attorney in Philadelphia, PA, one Michael Farrell, Esq., and the substance of these communications.   JA 1332-1343.

> More importantly, there's an attorney in the Philadelphia area, a Mr. Michael Farrell, who Mr. Cariglio [trial counsel to Mr. Leahy]  has acknowledged in this court during one of our previous hearings that he has maintained contact with Mr. Farrell in Philadelphia regarding the progress of this case. And indeed we know for a fact that there's been telephone communications between the two of them.

JA 1332, lines 14-20.

Government counsel averred that the substance of the conversations

---

[4]  Upon information and belief, the defense averred that there were three defendants remaining in the case at the point of the overhearing, and whose counsel participated in the calls with Mr. Farrell.

39

related to the provision of funds to codefendants who remained fugitives in this

matter, and that this rendered Mr. Leahy a flight risk.  Government counsel

therefore attempted to posit this as a basis to detain Mr. Leahy pending appeal, and

to deny him self-surrender, by suggesting a plot on the part of the defense to

obstruct justice.

> Because Mr. Cariglio has been in contact with Mr. Farrell up in
> Philadelphia who is funneling money from one or more of those
> fugitives to other defendants trying to get them to cooperate.

JA 1342, lines 17-20.

Thereafter, trial counsel who had participated in calls with Farrell

consulted, and ultimately all filed motions for the disclosure of the intercepted

communications.  JA 1364, ECF 770 (Leahy, filed May 22) ; *see* docket ECF 766

(Marcantoni, filed May 20), 767 (McIntosh, filed May 20).  Each of these filings

was accompanied by affidavits from counsel of record who had participated in the

calls with Mr. Farrell.

When the government did not respond to this filing in a timely

fashion, the defense moved to dismiss the indictment and vacate the verdict.    JA

1372, ECF 791 (filed June 12).  Subsequent to the filing of the motion to dismiss,

the government filed a response lacking any explanation or justification for its

decision to ignore the motion for disclosure or to respond in a timely fashion, and

likewise failing to address the basis for this statement by counsel at Mr. Leahy's

sentencing.  JA 1380, ECF 792 (filed June 13).  The defense filed a reply to this

response, observing that this response was untimely and reiterating its entitlement

to relief, and requesting a hearing on its motions.  JA 1385, ECF 794 (filed June

20).

     Of especial import in the government's filing was the failure of

government counsel to describe the basis for her averments to the district court at

Mr. Leahy's sentencing.  What the government stated in its filing, and no more,

was that the case agent had denied any knowledge of monitored calls by defense

counsel, JA 1383, ECF 792.  This may well be, but did and does not address the

basis for the knowledge of government counsel which undergirded her statements

to the district court at sentencing.  The inescapable fact that the government did

not actually address this demand was raised to the attention of the district court by

the defense.

> Whether or not  [case agent] SA Buskey has any knowledge
> concerning monitoring of calls involving Mr. Leahy's counsel speaks
> neither to the nature nor the extent nor the basis for the plain
> knowledge which AUSA Johnston clearly averred to this Court
> indeed was hers.  AUSA Johnston made such averments as an officer
> of the Court.

JA 1386, ECF 794, p 2 .  The defense reply continued, pointing out that there were

only two potential bases for the statements by government counsel at Mr. Leahy's

sentencing, **either** that privileged communications had been overheard by the

government (which obviously extends far beyond SA Buskey and her knowledge),

**or** that the claims concerning a plot to obstruct justice were plainly false when

made at Mr. Leahy's sentencing.

The question of whether AUSA Johnston knows of — and even
requested, ordered or directed – such monitoring, however, remains
yet unanswered by the government's response.  It remains
unanswered notwithstanding the clear imperative of DOJ policy, as
set out in the USAM, that when a *prima facie* showing is made by a
defendant regarding such monitoring of privileged communications, a
complete response be made.  Such a complete response is necessary,
nay, imperative, so as to dispel the imprimatur of misconduct which is
given rise to by such averments, which is why the defense is
obligated to make its threshold showing supported by affidavit.  The
only manner by which such serious allegations can be addressed, and
suspicions allayed, is by a direct response to such allegations, and this
has yet to be forthcoming from the government.  Far from directly
addressing the defense allegations made by three members of the
defense bar, the government attempts what is nothing more than a bit
of legal sleight-of-hand, intended to obfuscate rather than illuminate.

There is of course another possibility.  AUSA Johnston's
claims of purported knowledge could have been false, and knowingly
so, when she made them on April 1.  That would not have prejudiced
the defense in the manner described in the several motions for
disclosure as filed herein, although such might well entitle Mr. Leahy
to a new sentencing hearing, based upon what would have been
affirmative and deliberate misrepresentations by government counsel
at his original sentencing, regarding the suggestions of possible
obstruction of justice by Mr. Leahy and his counsel.  Mr. Leahy freely
admits that he is without any knowledge as to whether such
statements indeed were false, and in suggesting this as a possibility
advances no proposition other than to suggest that, based upon the
record, such falsity is the only alternative possible explanation for

AUSA Johnston's comments.

JA 1387, ECF 794, p 3.

There is no other possibility of which counsel for Mr. Leahy or his codefendants has been able to conceive, and neither of these possibilities has yet been dispelled by the government's filings.

Nor has either of these possibilities been dispelled by the district court. Two months after the June 20 defense reply, JA 1372, ECF 791, the district court denied the defense motions without hearing. JA 1390, ECF 832 (filed October 15). In so ruling, the district court abdicated its responsibilities to Mr. Leahy to safeguard the criminal trial process.

## Argument

It remains uncontroverted that communications involving defense counsel which referenced trial strategy were intercepted and overheard by the government, and the contents thereof were transmitted to AUSA Johnston, assuming she did not participate in the interception in the first place. AUSA Johnston made claims on the record as an officer of the court at Mr. Leahy's sentencing relating to the contents of and based upon the interceptions, and has yet to deny that such took place. Nor has she yet chosen to explain the basis for these claims. This interception operated to infringe the rights attaching to Mr. Leahy

43

and the other defendants under the Fifth and Sixth Amendments to the United States Constitution, and was presumptively prejudicial. *United States v. Danielson,* 325 F.3d 1054, 1071 (9th Cir. 2003); *United States v. Levy,* 577 F.2d 200, 209 (3rd Cir. 1978).

With the establishment by the defense of the underlying predicate to this prejudice, that privileged communications have been intercepted, the government bears the burden of dispelling this prejudice, *United States v. Danielson,* 325 F.3d at 1071. The government has failed to do so, notwithstanding the requirement by the DOJ that government counsel must do so in response to such a claim. *United States v. Alter,* 482 F.2d 1016, 1026 (9th Cir. 1973); USAM, CRIMINAL RESOURCE MANUAL, Ch. 37, Attorney Overhearings.

The establishment of prejudice does not turn on whether the government's invasion of the privilege was intentional, *United States v. Levy,* 577 F.2d at 210, *see United States v. Black,* 385 U.S. 26, 28-29 (1966), and it is more than enough that the government or its agents "acted affirmatively to intrude into the attorney-client relationship and thereby to obtain the privileged information," *United States v. Danielson,* 325 F.3d at 1071. It has been held that this presumption of prejudice is **irrebutable** when the government obtains privileged information through a "purposeful intrusion into the attorney-client relationship."

*Shillinger v. Haworth,* 70 F.3d 1132, 1142 (10th Cir. 1995); *accord State v. Lenarz,* 22 A.3d 536, 557-558 (Conn. 2011); *State v. Quattlebaum,* 527 S.E.2d 105, 109 (S.C. 2000).

The question of whether or not such intrusion was "purposeful" was not resolved, nor even inquired about, by the district court, and remains unknown even to the date of this Brief.  Of more significant import is the equally unaddressed question of when and how often such intrusion took place, and whether it was before or during trial, which time frame for such intrusion necessarily would raise serious questions about the reliability of the trial process for Mr. Leahy and his codefendants.  *United States v. Black,* 385 U.S. at 28-29; *accord, United States v. O'Brien*, 386 U.S. 345 (1967).  All that the district court knew was that SA Buskey had no knowledge, and this, apparently, was sufficient for the court to accept on behalf of the government entire.  This, although the record is entirely bereft of any evidence regarding the basis for the knowledge by government counsel which underlay these claims.  Such acceptance by the district court was notwithstanding the precision and detail of AUSA Johnston's averments at sentencing, which she was not obligated to illuminate.  Instead of imposing a "burden" upon the government, the district court's ruling chooses to impose a burden on the defense, to establish that which they cannot know and of which the

45

government has sole control.  JA 1390, ECF 832.

Standing in stark contrast to the district court's ruling, the view of the Supreme Court is that the importance of this issue cannot be overstated, which position the Court adopted in responding to an admission by the government that privileged communications had been overheard, even inadvertently, during a criminal prosecution.

> [W]e believe that a new trial must be held. This will give the parties an opportunity to present the relevant evidence and permit the trial judge to decide the questions involved. It will also permit the removal of any doubt as to Black's receiving a fair trial with full consideration being given to the new evidence reported to us by the Solicitor General.

*United States v. Black*, 385 U.S. at 29.

The gravity of these claims is well-understood by the defense. Nonetheless, with an entire absence of an evidentiary basis or understanding of the source of the information placed on the record by government counsel as an officer of the court, coupled with the affirmative choice by the government to ignore the DOJ requirement that a complete response be made, and the trial court's refusal to compel the provision of either a response to the defense request or an evidentiary basis for the representations by government counsel taken from privileged communications by defense counsel, this is the only reasonable and appropriate course for Mr. Leahy to chart.  A new trial must be ordered, or

alternatively this matter must be remanded for an evidentiary hearing to establish the basis for government counsel's representations, and then to determine whether the trial process was tainted by this misconduct.

## <u>CONCLUSION</u>

For the foregoing reasons, Appellant Keegan Leahy respectfully requests this Court to reverse the judgment of the United States District Court for the District of Maryland, and to remand his cause with an order for a new trial on the merits, and to tax the costs of these proceedings to Appellee.

April 21, 2014                          Respectfully submitted,


<u>/s/ Michael D. Montemarano</u>
MICHAEL D. MONTEMARANO

Michael D. Montemarano, P.A.
10630 Little Patuxent Parkway
Suite 146
Columbia, MD 2144
(410) 992-0067/992-6915
montemarano67@gmail.com

Counsel for Appellant/CJA Counsel

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.    This brief  complies with the Type-volume limitation of Fed. R. App.
       32(a)(7)(B) because:

              The page count of this brief is <u>9,584 words</u>.

2.    This brief complies with the typeface requirements of Fed. R. App. P.
       32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)
       because:

              This brief has been prepared in a proportionally spaced typeface using
              <u>Corel WordPerfect, Times New Roman, 14 point</u>.

April 21, 2014

                            <u>/s/ Michael D. Montemarano</u>
                            Michael D. Montemarano

48

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Rule 25 of the Rules of the United States Court of Appeals for the Fourth Circuit, I hereby certify that I have this 21st day of April, 2014, filed the required copies of the foregoing Brief of Appellant and copies of the Joint Appendix in the Office of the Clerk of the Court via hand delivery and electronically, and have served the brief and appendix electronically through CM/ECF, to Deborah Johnston, Esq., Assistant United States Attorney, 6500 Cherrywood Lane, 4th Floor, Greenbelt, MD 20770, Counsel for Appellee.


<u>/s/ Michael D. Montemarano</u>
MICHAEL D. MONTEMARANO